# IN THE COURT OF APPEALS OF IOWA

No. 21-0091
Filed August 4, 2021

**IN THE INTEREST OF K.S. and M.J.,**
**Minor Children,**

**D.J., Mother,**
　　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

A mother appeals the termination of her parental rights.　**AFFIRMED.**

Charles E. Isaacson of Charles Isaacson Law P.C., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Yvonne C. Naanep, Des Moines, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Mullins and Schumacher, JJ.

**BOWER, Chief Judge.**

A mother appeals the termination of her parental rights to K.S., born in September 2016, and M.J., born in September 2017.[1] Because the statutory period for reunification had long expired and the mother had not yet adequately addressed her assaultive behaviors, we affirm.

The family came to attention of the Iowa Department of Human Services (DHS) on April 15, 2019, when the mother—with her two children in the back seat—intentionally rammed her vehicle into the vehicle of her paramour, J.R. She was arrested and charged with domestic-abuse assault with intent to inflict serious injury and two counts of child endangerment without injury. A no-contact order (NCO) was put into place prohibiting the mother from contacting the children or J.R.

When the mother was arrested, the children were placed in the care of their maternal grandmother. However, they were moved to the care of their maternal great-grandmother because the grandmother reported she could not care for them in addition to her own special-needs child. This placement was about two and one-half hours away from the mother's home. A May 10 temporary removal order was confirmed by order dated June 10.

On June 26, the mother pleaded guilty to domestic-abuse assault with intent to inflict serious injury and two counts of child endangerment. She received a deferred judgment and was placed on probation for two years. The terms of her

---

[1] The children's fathers' rights were also terminated. Neither father appeals.

probation included obtaining a psychological evaluation and following all recommendations and participating in a parenting class. The NCO was lifted.

The children were adjudicated children in need of assistance (CINA) on June 27. The DHS report to the court before the CINA adjudication hearing noted family reunification would require the mother to secure housing for herself and her children; obtain a mental-health evaluation and follow recommendations; obtain parenting education to be able to model appropriate behavior; and successfully complete her probation. The court ordered the mother to comply with a mental-health evaluation, substance-abuse evaluation, drug screens, and domestic-violence services.

On July 2, the mother's probation officer filed a report of violations of the terms of probation alleging the mother had failed to pay court-imposed costs; had not provided proof of obtaining a mental-health evaluation; had not provided proof of enrolling in a parenting class; and, on June 28, she had been arrested and charged with assault with intent to inflict serious injury and criminal mischief.[2] The probation officer sought a warrant for the mother's arrest. On August 5, the mother stipulated to the violations and was ordered to serve five days in jail for contempt and continued on probation. She was also ordered to obtain a substance-abuse and mental-health evaluation and follow up with recommended services, complete a cognitive-behavioral program, and provide proof of completing an assaultive-behavior class.

---

[2] These charges were based on the mother's having rammed her vehicle into J.R.'s girlfriend's vehicle.

On November 1, a permanency hearing was held, and the court granted a DHS-recommended six-month extension to allow family reunification.[3] On November 21, upon the recommendation of the DHS and the children's guardian ad litem (GAL), the children were moved from the great-grandmother's home to the grandmother's to facilitate parent-child visits.

A second report of probation violation was filed March 19, 2020, asserting the mother was not paying court-imposed costs, failed to maintain employment, and had not provided proof of completing community service or an assaultive-behavior class. She had also been arrested on March 11 and had not reported the arrest. The probation officer asked a warrant be issued and the mother be required to serve ten days for contempt with the option to purge the contempt by providing proof of employment, paying toward her supervision fee, and setting up a payment plan.

An addendum to the March 19 report of probation violation was filed April 27, alleging that, on April 10, the mother had violated a criminal NCO. The probation officer recommend she serve ten days for contempt with the option to purge by providing proof of employment, payment plan for supervision fee and court-ordered financial obligations, proof of payment for an assaultive-behavior class, and completing fifty hours of community service.

A permanency review hearing was held on May 1 and the court found:

---

[3] The October 22, 2019 DHS report to the court noted the mother had obtained a substance-abuse evaluation, which had not recommended any treatment. However, the mother had yet to obtain a mental-health evaluation and was not engaged in mental-health services, which the case manager believed was very important because "[s]he will need to gain insight on how her impulsive thinking puts her children's safety at risk."

> The mother was previously granted a [six] month extension. Everyone wants the mother to regain custody of the children. Unfortunately, she still has not started therapy—as previously recommended. She had an initial therapy appointment set for [April 8, 2020]. The mother did not appear for the appointment. DHS noted the mother needs "to address her domestic violence in therapy and gain an understanding of how this impacts her children and her ability to parent safely." Also, the mother has new charges. There is currently a warrant for the mother's arrest for violating a [NCO]. The court advised the mother to turn herself into law enforcement.
>
> . . . .
>
> The primary permanency goal right now is termination of parental rights and adoption. The mother can change that goal by immediately-fully participating in recommended services.

Unfortunately, the immediate and full participation with recommended services did not occur.

On July 7, the mother was arrested and a probation order was filed noting the mother was in custody. She was found in contempt and ordered to serve ten days, but could purge the contempt by entering into payment plans for both her court-imposed costs and supervision fee, enroll and complete the assaultive-behavior class, complete fifty hours of community service, and commit no new violations.

On July 31, the mother obtained an initial assessment for a mental-health evaluation and completed the evaluation on August 8. The evaluator found the mother met the criteria for an unspecified adjustment disorder. The mother was pregnant by J.R. but reported she was no longer in a romantic relationship with him. The evaluator recommended the mother participate in therapy services, attend visits with her children, follow DHS and service provider recommendations, and attend medical appointments related to her pregnancy.

On August 5, a petition to terminate the mother's rights was filed. On August 12, the mother had her first visit with her children since April.

The termination of parental rights trial was held on September 3. The mother testified she was in good standing with her probation, she had completed her community service hours, and entered into a payment plan but still had five days of jail to complete in connection with the NCO violation. She also stated she had paid for the assaultive-behaviors class, which was to begin on September 12, was attending mental-health therapy sessions, and she had obtained housing and employment. The mother acknowledged visits with the children had been put on hold while there was a warrant pending. She explained she did not turn herself in in May because she was unemployed at the time and had no money to bond out. She asked that the children be returned to her care or stay with the grandmother until she finished her five-day jail sentence. The court took the matter under advisement.

On October 27, DHS filed a motion to modify the children's placement because the grandmother could no longer maintain their care and asked that the children be moved. While other relative placements were being investigated, none were available at the time, so DHS recommended foster care placement. The court granted the motion to modify disposition.

On October 28, the mother filed a motion to reopen the record because "significant events have transpired" that would impact the court's best-interest analysis. The motion was set for hearing.

At the December 4 hearing, the GAL argued against reopening the record and recommended termination of parental rights. The court allowed additional

testimony and admitted an update from the mother's therapist, noting the mother's participation in sessions, and a November 30 DHS report addendum which noted the foster parents reported they would adopt both children if relatives were not an option. The mother testified she had served her jail time, had no outstanding criminal charges, and was in good standing with probation. She had housing; was employed;[4] and, although the grandmother was not a long-term care option, she was available to assist in child care. She asked that the children be returned to her.

The DHS case manager testified, acknowledging the mother was finally making positive strides in meeting the goals of the case plan. However, she did not support further delay in the proceedings and continued to recommend termination of parental rights. She noted visits remained fully supervised. The children were demonstrating aggressive and regressive behaviors after visits with the mother. She also expressed concern about the mother's ability to care for an infant and deal with reintroducing the two older children to the household.

On January 5, 2021, the juvenile court wrote:

The issue is whether after [nineteen] months of services and [five] different placements for the young children, the court should terminate the parents' rights. The children are struggling. After visits with the mother, they have behavioral issues. These issues have increased exponentially due to the length of this case. The mother continued a pattern of criminality, arrest warrants and incarcerations—which repeatedly stopped visits for extended periods of time. Also, she still has not addressed her toxic, domestic violence connection with [J.R].

---

[4] She stated she was not currently working because her child was due but she still had a job and intended to return to work after the baby was born.

The juvenile court noted the mother had not attended therapy sessions between September 9 and October 11, 2020, and the therapy was not addressing domestic-violence or assaultive-behavior issues but focused on the mother's stress from the juvenile proceedings. The court also observed the mother was not consistent with visits—she was in jail October 1 through 6 and did not have visits from October 29 through November 17 due to another arrest warrant.[5] The court concluded the children could not be returned to the mother's custody at present because she had not adequately addressed here domestic violence with J.R., who she continued to rely on for financial support and with whom she intended to co-parent their newborn. The court also concluded termination of the mother's parental rights was "less detrimental than the harm caused by continuing the parent-child relationship."

The mother appeals, asserting the grounds for termination have not been proved.[6] She also contends termination of her parental rights is not in the children's best interests.

"We review proceedings terminating parental rights de novo." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

---

[5] This appears to be related to the March 2020 theft charge. The mother did plead guilty to fifth-degree theft and was fined.

[6] The court terminated parental rights pursuant to Iowa Code section 232.116(1)(f) (K.S., age four) and (h) (M.J., age three) (2020). These two paragraphs allow the court to terminate parental rights when a child who has been adjudicated a child in need of assistance (CINA) has been out of the parent's custody for the statutory period and cannot be returned to the custody of the parent "at the present time."

The mother concedes the children have been adjudicated CINA and have been out of her custody for longer than the statutory period. She argues, however, the children could be returned to her "at the present time." "At the present time" refers to the time of the termination hearing. *See id.* at 111. We agree with the juvenile court the mother has not addressed the underlying concerns for her assaultive behaviors and the domestic violence between her and J.R. Nothing in this record establishes the mother actually attended the assaultive-behaviors class and the therapist's update does not indicate therapy focused on domestic violence or assaultive behaviors. Without addressing those underlying concerns, the children remain at risk in her care. *See In re K.M.*, No. 16-0157, 2016 WL 1359127, at *2 (Iowa Ct. App. Apr. 6, 2016) (noting father's failure to address domestic violence issues).

While we appreciate the mother's current positive steps—taken just prior to or after the filing of the termination petition—they are but the first on her road to stability. We have consistently stated "[a] parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("[C]hanges in the two or three months before the termination hearing, in light of the preceding eighteen months, are insufficient.").

The mother objects to the juvenile court's "generic idea" of the children's need for permanency. The mother argues "[n]othing about what will happen to these children in this case suggests permanence" and "[t]he court should assume termination will make things worse for the children." However, the legislature has established a different presumption. *See id.* at 494 (noting once statutory

requirements are met "the legislature . . . has made a categorical determination that the needs of a child are promoted by termination of parental rights" (citation omitted)). Because the statutory period has been far exceeded here, we must view the situation with a sense of urgency. *See id.* at 495.

When considering children's best interests, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). We recognize there is no current permanent placement identified. Yet the children are in a suitable foster home with caregivers who are addressing their physical and emotional needs. The children are adoptable and the foster family has indicated a willingness to adopt both children. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted). We agree with the juvenile court that termination of the mother's parental rights and adoption will give the children a chance at stability and permanency they have been denied while waiting for their mother to address her underlying issues. We affirm.

**AFFRIMED.**